## Commonwealth vs. Michelle Ellerbe.

Suffolk. November 5, 1999. - February 16, 2000.

Present: Marshall, C.J., Abrams, Lynch, Greaney, Ireland, Spina, & Cowin, JJ.

*"School Zone" Statute. Practice, Criminal,* Required finding, Assistance of counsel, Disclosure of evidence. *Search and Seizure,* Motor vehicle, Impoundment of vehicle. *Due Process of Law,* Disclosure of evidence, Assistance of counsel.

An inventory search by police of a valuable motor vehicle before it was towed for safekeeping, where the police had no other practical available option other than towing, was appropriate under written police guidelines: the impoundment and search pursuant to police guidelines were lawful and the evidence seized was properly admissible in evidence. [772-777]

A criminal defendant did not demonstrate that her trial counsel was ineffective. [777-779]

A mistrial of a criminal case was not warranted for the prosecutor's failure to have disclosed before trial certain alleged statements of the defendant when arrested, where no prejudice was shown [779-781]; nor was a mistrial warranted for Commonwealth witnesses' asserted improper hearsay testimony, in light of the judge's rulings and curative instructions [781-782].

Complaint received and sworn to in the Dorchester Division of the District Court Department on July 11, 1997.

The case was tried before *E. Sydney Hanlon,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Juliane Balliro* for the defendant.

*Jennifer M. Davis,* Assistant District Attorney (*Patrick M. Haggan,* Assistant District Attorney, with her) for the Commonwealth.

*John J. Conte,* District Attorney, *& Katherine E. McMahon,* Assistant District Attorney, for the District Attorney for the Middle District, amicus curiae, submitted a brief.

Marshall, C.J. The defendant, Michelle Ellerbe, was convicted of operating a motor vehicle after suspension of her license, possession of a class B substance with intent to

distribute, possession with intent to distribute drugs in a school zone, possession of a class A substance, and offering a gift to a police officer.[1] She appealed and we transferred the case to this court on our own motion.

For the reasons given below, see part II A, we reverse her conviction of possession with intent to distribute drugs in a school zone. The defendant challenges the denial of her motion to suppress the illegal drug evidence seized in an inventory search of her car, asserting the search was unconstitutional. There was no practical available alternative to the towing of her car that led to the search. We therefore conclude the inventory search was constitutional and affirm the order of the motion judge. See part II B. The defendant also argues that she was denied effective assistance of counsel, an argument we reject. See part II C. Finally, we disagree with the defendant's argument that there was prosecutorial misconduct. See part II D. We consequently affirm her convictions of possession of a class B substance with intent to distribute and offering a gift to a police officer.

## I

The motion judge, who was also the trial judge, found the following facts. After the defendant drove through a red traffic light, two Boston police offices pursued her vehicle, a BMW automobile, turning on their lights and siren. After traveling some distance, the defendant pulled her vehicle into the parking lot of a convenience store. A sign in the store's parking lot stated that the lot was to be used only by customers of the store and that other cars would be towed.

When the defendant informed the officers that her license had been suspended, she was arrested for operating a vehicle after suspension of her license. One of the officers asked the only passenger in the car whether she had a driver's license, and was told that she did not have it with her. The officers then decided to have the car towed, and to conduct an inventory search of the car beforehand.

During the inventory search, one of the officers discovered on the floorboard a black leather coin bag that had a key marked

---

[1]The convictions of operating a motor vehicle after suspension of her license and possession of a class A substance were placed on file with the defendant's consent and are not before us on appeal.

"1993 BMW, Ellerbe," hanging from it. Inside the coin bag were thirty-five plastic bags, each containing a white, rock-like substance the officer believed to be crack cocaine, and another bag containing a white powder the officer believed to be heroin. When the officer asked whose bag it was, the defendant pointed to the passenger and said, "That's hers." The passenger responded, "Michelle, how could you say a thing like that? You know that's not mine."[2]

At trial, a defense witness, James Eady, testified that the bag containing the drugs belonged to him. He said that one month earlier while getting a ride from Timothy Ellerbe, the defendant's fiancé,[3] he had surreptitiously taken the spare BMW key, having planned to steal the car later, and put the key inside the bag with the drugs he was carrying. Eady said he then left the bag with the drugs under the car seat because he knew the police were looking for him. Eady testified he was arrested and jailed for other reasons later that day, before he could get back to the BMW to get the pouch. Before trial Timothy Ellerbe had signed an affidavit stating the drugs were his, but recanted that portion of the affidavit while testifying.[4]

At trial, the arresting officer testified that after his partner showed him the drugs found in the car, the defendant said to him, "What can I do to make this go away? I will give you $10,000 cash if you'll let me go. I have two kids. Please, please." The passenger testified she did not hear the defendant offer the officer $10,000, although she heard the defendant say, "I have two kids; I can't go to jail."[5]

---

[2]After the drugs were discovered, the officers decided to place the passenger under arrest as well.

[3]Timothy Ellerbe testified that he and Michelle Ellerbe had known each other thirteen years, lived together, had two children, and shared ownership of cars, property, and bank accounts.

[4]Eady and Timothy Ellerbe both testified that they had met that summer while jointly incarcerated, and that, when Eady found out that Michelle Ellerbe had been arrested for possession of Eady's drugs, he decided to come forward and testify the drugs were actually his.

[5]The arresting officer testified that the passenger and the other officer were at least twenty to twenty-five feet away when this statement was made. A bystander in the parking lot testified that he heard the defendant tell the officer she had two children and did not know anything about the bag, but did not hear the defendant offer any of the officers $10,000. Another bystander testified that she heard the defendant mention her two children to the officer and ask whether there was anything she could do to get out of the situation, but

## II

### A

The defendant claims that the judge erred in denying her motion for a required finding of not guilty on the charge of possession with intent to distribute drugs in a school zone. The Commonwealth concedes that the testimony at trial was insufficient to establish an essential element of this offense — that the school was a "public or private elementary, vocational, or secondary school" as then required by the relevant statute, G. L. c. 94C, § 32J, as amended by St. 1993, c. 335 — and concedes that this conviction should be reversed.[6] We consequently reverse the defendant's conviction of possession with intent to distribute drugs in a school zone. Judgment on this charge is to be entered for the defendant. See G. L. c. 94C, § 32J; *Commonwealth* v. *Burke*, 44 Mass. App. Ct. 76, 79 (1997); *Commonwealth* v. *Gonzales*, 33 Mass. App. Ct. 728, 729-730 (1992); *Commonwealth* v. *Vasquez*, 33 Mass. App. Ct. 950 (1992).

### B

The defendant argues that the judge erred in denying her motion to suppress the evidence found in her vehicle where the police department's written rules concerning vehicle impoundments and related inventory searches allow officers discretion concerning whether to impound a vehicle. Alternatively, if the police department's current inventory search policy is lawful, she argues the officer who conducted the search failed to follow that policy. She asserts her rights under the Fourth and Fourteenth Amendments to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights against unreasonable search and seizure.[7]

Under both the Federal and Massachusetts Constitutions,

---

stated that she did not hear the defendant offer the police any cash to let her go.

[6]Effective July 1, 1998, shortly after the defendant's trial, G. L. c. 94C, § 32J, was amended to provide that the relevant school be "a public or private accredited preschool, accredited headstart facility, elementary, vocational, or secondary school whether or not in session." G. L. c. 94C, § 32J, as amended through St. 1998, c. 194, §§ 146, 443.

[7]The defendant makes passing reference to violations of art. 12 of the Mas-

analysis of the legitimacy of an inventory search of an impounded vehicle involves two related, but distinct, inquiries: (1) whether the impoundment of the vehicle leading to the search meets constitutional strictures, and (2) whether the conduct and scope of the search itself meet those strictures.[8] See *Commonwealth* v. *Garcia*, 409 Mass. 675, 678, 680 (1991); *United States* v. *Duguay*, 93 F.3d 346, 351 (7th Cir. 1996), appeal after remand, 165 F.3d 33 (7th Cir. 1998), cert. denied, 526 U.S. 1029 (1999). See also *Commonwealth* v. *Caceres*, 413 Mass. 749, 750-751 (1992) (discussing guidelines for commencement of search and impoundment of vehicle as separate question from guidelines for conduct of search). The second aspect of the analysis is not at issue in this case, and has been elaborated in other decisions.[9] Our examination of the constitutionality of this search centers instead on the validity of

sachusetts Declaration of Rights, but does not develop her argument. Consequently, we treat any claims under art. 12 as waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975) (appellate court "need not pass upon questions or issues not argued in the brief"). See also *Commonwealth* v. *Fraser*, 410 Mass. 541, 543 n.3 (1991) (finding defendant's claim under art. 14 of the Massachusetts Declaration of Rights waived when asserted but not developed separately in argument).

[8]To withstand constitutional challenge, under both the Fourth Amendment and art. 14, inventory searches must be done in accordance with standard police operating procedures. See *Colorado* v. *Bertine*, 479 U.S. 367, 374-375 (1987); *Commonwealth* v. *Garcia*, 409 Mass. 675, 680-681 (1991); *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988). Under art. 14 of the Massachusetts Declaration of Rights, those standard procedures must be in writing. See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 553 (1995); *Commonwealth* v. *Figueroa*, 412 Mass. 745, 748 (1992); *Commonwealth* v. *Garcia*, *supra* at 684; *Commonwealth* v. *Bishop*, *supra*. See also LaFave, Controlling Discretion by Administrative Regulations: The Use, Misuse, and Nonuse of Police Rules and Policies in Fourth Amendment Adjudication, 89 Mich. L. Rev. 442, 457 (1990), quoting *Commonwealth* v. *Bishop*, *supra* at 451 ("One might hope . . . that other courts will come to emulate the Massachusetts Supreme Judicial Court, which . . . held that the state constitution 'requires the exclusion of evidence seized during an inventory search not conducted pursuant to standard police procedures which . . . must be in writing' ").

[9]Decisions have addressed, for example, whether an inventory search may include closed containers in the vehicle, see, e.g., *Florida* v. *Wells*, 495 U.S. 1, 4 (1990); *Commonwealth* v. *Caceres*, 413 Mass. 749, 755 (1992); the vehicle's trunk, see, e.g., *Commonwealth* v. *Garcia*, *supra* at 684; *Commonwealth* v. *Ford*, 394 Mass. 421, 426 (1985); open portions of the interior sidewall of the passenger compartment, see *Commonwealth* v. *Figueroa*, *supra* at 748; partially covered portions of the trunk interior, see *Commonwealth* v. *Caceres*, *supra* at 754; and whether the search must be conducted according

the impoundment. "[T]he propriety of the impoundment of the vehicle is a threshold issue in determining the lawfulness of the inventory search." *Commonwealth* v. *Daley*, 423 Mass. 747, 749 (1996), quoting *Commonwealth* v. *Garcia, supra* at 678.

The Boston police department has written procedures, noted in the margin, that provide an officer with four options for handling the vehicle of an arrested driver.[10] The judge concluded, a conclusion not challenged by the defendant, that each of the options except the first — leaving the car with a person having authority to assume control over it — requires an arresting officer to inventory the car. The defendant contends that these written procedures are constitutionally defective because they allow substantial discretion to decide when to secure a vehicle and do not *require* the officer to choose the first option, where that option is possible. We conclude that a specific assessment of the constitutional sufficiency of the regulations is not necessary in the circumstances of this case because the police had no practical available alternative to towing the vehicle, and thus no discretion to exercise. Cf. *Commonwealth* v. *Daley, supra* at 750 ("where there is no practical available alternative, removal of a vehicle from a public roadway and an inventory search of it are constitutional"); *Commonwealth* v.

---

to standard, written police procedures, see *Commonwealth* v. *Bishop, supra* at 451.

[10]Rule 103, § 31, of the Rules and Procedures of the Boston police department, states in part:

"It shall be the responsibility of the arresting officer to dispose of the car in the following manner:

"1. leave it with a person having apparent authority to assume control over it; or

"2. park it legally, close the windows, lock it, if possible, and attempt to notify the registered owner; or

"3. leave it at the side of the road with windows closed and locked, if possible, if traffic is not obstructed and arrangements can be made for its removal without undue delay; or

"4. have it towed for safekeeping."

In addition, the department's inventory search policy requires that "[a]ll motor vehicles secured by the Boston Police . . . be inventoried." Under the policy, "securing" means "locking and leaving on the street, or towing." The policy specifies that "[i]n conducting such search, officers will examine any place in the passenger compartment which could contain valuable property. This will include closed but unlocked containers in the passenger compartment."

*Caceres, supra* at 751-752 (no alternative, no discretion involved).

"[I]mpoundment of a vehicle for noninvestigatory reasons is generally justified if supported by public safety concerns or by the danger of theft or vandalism to a vehicle left unattended." *Commonwealth* v. *Daley, supra.* See *Commonwealth* v. *Dunn,* 34 Mass. App. Ct. 720, 703-704 (1993), and cases cited (impoundment justifiable if supported by reason of public safety or danger of theft or vandalism); *United States* v. *Ramos-Morales,* 981 F.2d 625, 626 (1st Cir. 1992), cert. denied, 508 U.S. 926 (1993) (same). See also *South Dakota* v. *Opperman,* 428 U.S. 364, 369 (1976) (inventory practice for impounded vehicle essential to respond to incidents of theft and vandalism). Because the vehicle was not pulled over alongside a busy highway, but rather in a privately owned parking lot, the public safety justification for impoundment was lacking here. See *Commonwealth* v. *Dunn, supra* at 704. But there was specific evidence in this case pointing to a "danger that the vehicle left unattended" in the lot might "be vandalized or stolen," *id.,* and that danger, together with the need to protect the police from false claims of loss, justified impoundment. See *id.* at 706. See also *United States* v. *Kornegay,* 885 F.2d 713, 716 (10th Cir. 1989), cert. denied, 495 U.S. 935 (1990) (impoundment reasonable where arrestee's vehicle parked in private lot but leaving car there could have subjected it to vandalism); *United States* v. *Staller,* 616 F.2d 1284, 1290 (5th Cir.), cert. denied, 449 U.S. 869 (1980) (impoundment legitimate where arrestee's car parked at shopping mall lot but leaving car there overnight would run risk of vandalism or theft). The motion judge specifically pointed to these two concerns as applicable in the instant case.

The judge found that the vehicle was worth approximately $40,000 and that one of the arresting officers had grown up in the vicinity, had been assigned there for the previous one and one-half years, and was aware that there was considerable car theft and vandalism in the area. That officer's personal car had been broken into three times when parked at his home in the same area. Based on these findings, we cannot agree with the defendant that impoundment was not justified by the danger of theft, vandalism, or false claims against the police.

Here, there was no one immediately available who could remove the vehicle from the lot. As the judge found, the driver

was under arrest, and the passenger had no license with her.[11] Cf. *Commonwealth* v. *Daley, supra* at 750 n.4, citing *Commonwealth* v. *Caceres, supra* at 751 n.2 ("if the owner of the vehicle is present and proposes that his vehicle be turned over to a passenger, this should be done if the passenger displays a valid operator's license and is not under arrest or otherwise incapacitated"). Moreover, the judge found that there was no evidence that either the defendant or her passenger suggested to the officers any alternative to towing the car.[12] We also agree with the judge's reasoning that it is appropriate for the police to spare the private parking lot owner the burden of dealing with the vehicle's presence when the driver has been arrested. See *Commonwealth* v. *Dunn, supra* at 706. Reasonableness did not require police officers to guard the vehicle or to wait with the unlicensed passenger until a licensed driver could be produced to take control of it. See *Commonwealth* v. *Caceres, supra* at 751 n.1.[13] In the circumstances here, where private towing was a real possibility for a car left in the posted lot, and the officers determined at the time of arrest that the passenger legally could not drive the vehicle away, turning the vehicle over to the passenger was not a reasonable option for the officers. See *Commonwealth* v. *Caceres, supra* at 751-752.

The defendant also argues that the search was unlawful because the officer failed to follow police department procedures. The defendant seems to fault the officer for concluding that he had to tow the car where the operator was under arrest and the

[11]For the passenger legally to operate the vehicle, she would have to have her license to operate "upon [her] person or in the vehicle." G. L. c. 90, § 11.

[12]The defendant did submit an affidavit in support of her motion to suppress stating that she requested the police to verify the passenger's driver status but they refused to do so. The Commonwealth presented evidence refuting that claim. We see no clear error in the motion judge's findings on this point. See *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 384, cert. denied, 515 U.S. 1146 (1995), and cases cited.

[13]The defendant argues that the need to protect her vehicle against theft or vandalism was not a valid basis for impoundment because the passenger lived only a short distance from the scene of the search and had the authority of the defendant to take possession of the vehicle. The judge made no findings concerning how near or far away the passenger lived. In any event, in determining whether a search is reasonable, we cannot insist that there is an obligation on police officers affirmatively to investigate whether an unlicensed passenger can quickly secure a licensed driver to remove the automobile from a private parking lot whose owner places the public on notice that vehicles may not remain on the property.

passenger did not have a license with her, while, in fact, the passenger's identification "was easily verifiable at the scene." The officer's decision to tow was the only option available to him; any option that would not lead to a search was impracticable here. The motion judge found that "the search was conducted pursuant to the specific written regulations of the Boston Police Department." Given the apparent compliance of the officer with the department's procedures, the judge's finding to that effect, and the defendant's failure to point to a specific departure from the procedures or to any misunderstanding by the officer of the procedures that actually harmed her, we cannot conclude that the search was unlawful due to a failure to follow departmental procedures. In sum, we see no constitutional ground under either the Fourth Amendment or art. 14 to fault the judge's denial of the defendant's motion to suppress.

C

The defendant argues that she was denied effective assistance of counsel where, shortly after her arrest, her counsel filed a futile motion to dismiss with conflicting affidavits that, she claims, later undermined a critical aspect of her defense.[14] We judge claims of ineffective assistance of counsel by determining "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that . . . expected from an ordinary fallible lawyer," and whether any such inefficacy "has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

The defendant asserts that the motion to dismiss could not have been allowed as a matter of law,[15] and that the pointless motion was accompanied by conflicting affidavits concerning who owned the seized drugs, vitiating her defense at trial.[16] The defendant complains that the conflicting affidavits filed by her

---

[14]While appellate counsel was trial counsel and represented the defendant at the hearing on the motion to suppress, she was not the attorney who filed the motion to dismiss.

[15]The motion's stated grounds were "that the drugs in question did not belong to [the defendant] and that she had no knowledge of said drugs as is made more clear pursuant to the affidavits attached hereto." The defendant argues that a claim that a defendant has evidence favorable to her defense has never been ground for dismissal.

[16]The defendant also complains that counsel had failed to file a memorandum of law required to accompany a motion to dismiss, see Mass. R. Crim. P. 13

counsel — one from Timothy Ellerbe stating that the drugs in the black pouch later seized by the police were his and one from James Eady suggesting the drugs were his — undermined the credibility of later trial testimony of both men that the drugs were in fact Eady's and not the defendant's.[17]

The affidavits were not necessarily conflicting. Ellerbe's affidavit claimed that, although the defendant was the record owner of the impounded vehicle, it was in effect Timothy Ellerbe's "day to day automobile" that the defendant "did not have access to . . . unless it was an emergency." His affidavit stated that the drugs were accidentally left in the vehicle and were his property, and Eady's affidavit stated that he left the drugs in the car with Timothy Ellerbe's knowledge and consent — although Eady's affidavit does suggest his intent to retrieve the drugs from the car later. Counsel who filed the motion to dismiss could reasonably have believed that a judge could conclude from these affidavits that — whether the drugs were jointly owned by Eady and Timothy Ellerbe, in disputed ownership between those two, or had been transferred from one to the other in a deal Eady intended later to rescind — the drugs were *not* Michelle Ellerbe's.

We are also not convinced that submission of the affidavits caused a "devastating" blow to the defense generally and to the credibility, in particular, of Timothy Ellerbe's and Eady's account at trial that the drugs were Eady's.[18] There were other reasons the jury could have disbelieved Eady's or Timothy Ellerbe's testimony in addition to the possibly conflicting affidavits. Both witnesses were impeached by evidence of prior

(a) (4), 378 Mass. 871 (1979); failed to pursue a hearing on the matter; and inappropriately filed the motion in advance of the pretrial conference. The Commonwealth suggests, with considerable merit, that the motion to dismiss and associated affidavits may have been filed to forestall the defendant's possible surrender for violation of an existing probation order, played a role in the continuance of the defendant's probation surrender hearing until after this trial, and may have played a role in her receiving a suspended sentence there. It may be that, faced with the likelihood of an imminent probation surrender hearing, defense counsel undertook these measures not as part of any trial strategy, but to forestall the defendant's possible immediate incarceration.

[17]In offering Eady's August 21, 1997, affidavit, defense counsel had little choice but to offer Timothy Ellerbe's July 25, 1997, affidavit, as well. The latter affidavit had already been transmitted by facsimile to the defendant's parole officer on July 28, 1997.

[18]Timothy Ellerbe testified that he thought the drugs were either Eady's, or belonged to a friend of Eady, another recent passenger in the car.

convictions, see G. L. c. 233, § 21 (criminal convictions may be shown to affect witness's credibility), which for Eady included a conviction of giving a false name to the police. Eady also testified, in a manner the jury could have found not believable, that, despite his known heroin addiction, a drug dealer had given him the drugs at issue, worth over $600, without any advance payment by him.[19]

Timothy Ellerbe gave a plausible explanation before the jury for earlier claiming the drugs as his in the affidavit he later recanted. He testified that he signed the affidavit before he was able to speak with Eady because he felt responsible for the fact that the defendant, his fiancée, had been charged with their possession. In short, the defendant's possible gains from filing the motion to dismiss and the related affidavits were not so remote, nor were the possible risks of the affidavits so great, as to show counsel's tactical decision here amounted to conduct measurably below that expected of an ordinary fallible lawyer. The defendant's ineffective assistance of counsel argument is unavailing.

### D

The defendant argues she was entitled to a mistrial due to the prosecutor's failure to disclose prior to trial certain alleged statements of the defendant when she was arrested. During defense counsel's cross-examination of the officer, the following exchange took place:

*Q.:* "[The defendant] didn't say anything to you about how she was going to get this $10,000, did she?"

*A.:* "Yes, she did."

*Q.:* "She did?"

*A.:* "Yes."

Before the officer could elaborate, defense counsel requested a sidebar conference.

---

[19]The jury had also heard, in the context of questions concerning who would take responsibility or blame, testimony from the passenger that the defendant had told her someone named "Snake" or "Scooter" was responsible for the drugs, and that he would be compensated $10,000 for "taking the weight." This testimony might have cast doubt in the jury's minds on the motivations of others claiming to be responsible for the drugs.

Defense counsel complained to the judge that the officer's statement suggesting a conversation about how the defendant would get $10,000 had not been disclosed to her by the Commonwealth before trial, was not in the police report, and had not been elicited during the officer's direct testimony, and that the statement was prejudicial because it would reinforce the Commonwealth's position that the defendant was a drug dealer who could come up with $10,000 "at the drop of a hat." Defense counsel moved for a mistrial, without success. But, on the judge's instruction, this line of testimony was not pursued before the jury.[20]

The defendant relies heavily on *Commonwealth* v. *Vaughn*, 32 Mass. App. Ct. 435 (1992), to argue that the delayed disclosure required a mistrial. We agree that the surprise disclosure was inappropriate, but cannot conclude that the remedy of mistrial is warranted here. In the *Vaughn* case, the investigating officer's report and his grand jury testimony stated that he found two sets of footprints at the scene of the crime. *Id.* at 436, 437. In a surprise to the defense at trial, the officer changed his testimony to state he had found three sets of footprints — a critical change, because two persons other than the defendant had already pleaded guilty to the crime. *Id.* at 441-442. The *Vaughn* court found that the change in the officer's testimony was not a mere shift in details, but went to "the heart of the defendant's case" and to "the defendant's participation in the crimes." *Id.* at 439, quoting *Commonwealth* v. *Adrey*, 376 Mass. 747, 754 (1978). Cf. *Commonwealth* v. *Baldwin*, 385 Mass. 165, 174-176 (1982) (mistrial not warranted despite delayed disclosure at trial of statements that contained some significant variations from original police report disclosed to defendant).

Here, the officer did not change his testimony, and the additional information he proffered for the first time on cross-examination did not go to the heart of the defendant's case. Moreover, the jury heard that the officer's report did not contain any statement by the defendant on this subject, and this discrepancy in his accounts could have undermined this key prosecution witness's credibility and helped the defendant as much as the testimony hurt her. Cross-examination by the

---

[20]The police officer told the judge, out of the hearing of the jury, that the defendant told him she could immediately obtain $10,000 from an "ATM machine."

defense at trial immediately after the challenged statement underlined this discrepancy pointedly. The jury also had before them other evidence that suggested obtaining large sums of cash might not be difficult for the defendant.

The defendant further argues that her right to a fair trial was denied because the Commonwealth elicited inadmissible evidence from its witnesses. The judge had excluded any reference to an alleged statement by the defendant that she had two years "hanging over her head." In response to a general question about the nature of her postarrest conversation with the defendant, the passenger testified that the defendant said that "she had two kids and two years hanging over . . ." when the prosecutor interrupted the witness. We agree with the Commonwealth that the defendant has not shown that this statement "weakened [her] case in some significant way so as to require a new trial," *Commonwealth* v. *Daggett*, 416 Mass. 347, 352 n.5 (1993), quoting *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983), because the meaning of this sentence fragment either would have been unclear to the jury or could have been construed as a reference to the defendant's existing probation status, of which the jury was already aware.

The judge had also excluded any reference to the fact that food stamps were found on the defendant, and the defendant asserts that she was prejudiced by the admission of such testimony.[21] When an officer began to testify, improperly, that the defendant had food stamps on her at arrest, the prosecutor interrupted him.[22] The judge then struck the statement and instructed the jury to disregard it. Given the curative instruction, we conclude that the defendant was not prejudiced by the officer's statement and declaring a mistrial was unnecessary. See *Commonwealth* v. *Kilburn*, 426 Mass. 31, 37-38 (1997), and cases cited.

For the foregoing reasons, we reverse the defendant's convic-

---

[21]The defendant also claims in unconvincing fashion, without a reference to specific testimony, that the jury heard evidence that had been excluded by the judge concerning statements allegedly made by the defendant to the passenger as to whether she thought the defendant should "really . . . do two years," and that the Department of Social Services was opening a case against the defendant.

[22]These types of problems can be avoided by careful preparation of witnesses. The Commonwealth should take pains to inform its witnesses, in particular police witnesses, what areas are to be avoided when a judge has excluded reference to certain subjects.

tion of possession with intent to distribute drugs in a school zone, and direct the entry of judgment for the defendant. We affirm her convictions of possession of a class B substance with intent to distribute and offering a gift to a police officer.

*So ordered.*